## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| ISK BIOCIDES, INC. | |
| Plaintiff, | C.A. No. ___3:21-cv-00386___ |
| v. | **JURY TRIAL DEMANDED** |
| PALLET MACHINERY GROUP INC. and J&G MANUFACTURING LLC, | |
| Defendants. | |

## COMPLAINT

Plaintiff ISK Biocides, Inc. ("ISK") for its Complaint against Defendants Pallet Machinery

Group Inc.  ("PMG") and J&G Manufacturing LLC ("J&G") hereby states and alleges as follows:

## PARTIES

1.     Plaintiff ISK is a corporation organized under the laws of the State of Delaware

with a principal place of business at 416 East Brooks Road, Memphis, Tennessee 38109.

2.     Upon information and belief, Defendant PMG is a corporation organized under the

laws of the Commonwealth of Virginia with an address of 6496 Landing Road, King George,

Virginia 22485.

3.     Upon information and belief, Defendant J&G is a limited liability company

organized under the laws of the state of Florida with an address of 4451 Gulf Shore Boulevard

North, Suite 302, Naples, Florida, 34103.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over the claims asserted herein pursuant

to 28 U.S.C. §§ 1331, 1332, and 1338, and 15 U.S.C. §§ 1116 and 1121, as this case arises under

the Lanham Act.  This Court also has supplemental jurisdiction over Plaintiff's state and common law claims pursuant to 28 U.S.C. § 1367.

5.      At all times relevant to this lawsuit, PMG, and one or more of its agents, have been engaged in the business of advertising, promoting, marketing, distributing, and/or selling, within the Eastern District of Virginia and in interstate commerce throughout the United States, the products which are the subject of this Complaint, namely, a product that is named WoodLock Bio-Shield Mold Inhibitor, which be manufactured as either Bio-Shield I, Bio-Shield II, or Bio-Shield H.  The active ingredient in WoodLock Bio-Shield Mold Inhibitor differs depending on whether it is manufactured as Bio-Shield I, Bio-Shield II, or Bio-Shield H.

6.      Upon information and belief, at all times relevant to this lawsuit, J&G, and one or more of its agents, have been contracted by PMG, a Virginia corporation with its principal place of business in the Eastern District of Virginia, to manufacture WoodLock Bio-Shield Mold Inhibitor with knowledge that WoodLock Bio-Shield Mold Inhibitor is to be advertised, promoted, marketed, distributed, and/or sold within the Eastern District of Virginia and in interstate commerce throughout the United States.

7.      PMG is subject to personal jurisdiction in this judicial district because, upon information and belief, PMG is incorporated in the Commonwealth of Virginia and PMG has its principal place of business in the Eastern District of Virginia; this claim arises from PMG's transaction of business in the Commonwealth of Virginia; and this claim arises from PMG's causing of tortious injury by act or omission in the Commonwealth of Virginia

8.      J&G is subject to personal jurisdiction in this judicial district because, upon information and belief, this claim arises from J&G's contracting to supply services or things in the Commonwealth of Virginia; this claim arises from J&G's causing tortious injury in the

Commonwealth of Virginia by an act or omission outside of the Commonwealth of Virginia and J&G regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the Commonwealth of Virginia; because J&G has reached into the Commonwealth of Virginia to solicit or initiate business; because J&G has deliberately engaged in significant or long-term business activities in the Commonwealth of Virginia; because J&G has made contact with PMG regarding the business relationship between J&G and PMG; because contracts between J&G and PMG required performance of duties in the Commonwealth of Virginia; because this case arises out of J&G's contacts with the Commonwealth through its business with PMG.

9.      Venue is proper in this judicial District over this claim because a substantial part of the events or omissions giving rise to the claims occurred in this judicial District or, in the alternative, because PMG and J&G are subject to personal jurisdiction in this District for these claims.

## STATEMENT OF FACTS

### A.      ISK

10.     ISK and its predecessors and affiliates have been developing and formulating wood protection products for industrial and commercial applications for over 80 years.  ISK is the parent company and sole stockholder of IBC Manufacturing Company, which has been operating since 1933 in Memphis, Tennessee, when it was founded as Chapman Chemical Company.

11.     ISK is in the business of marketing, promoting, distributing, and selling wood protection products, including numerous pallet treatment products, such as NeXgen® Wood Protectant Fungicide, Tuff-Brite® Mold Control Additive, and PQ-80® and PQ-8® fungicide concentrates.

**B.**     **Wood Pallet Treatment Products**

12.     Wood pallets are used for stacking, storing, protecting, and transporting materials in the course of being handled by materials handling equipment such as forklifts, and then being stored in racking or bulk storage.  Pallets are widely used throughout the supply chain of numerous products which are sold throughout the United States.

13.     Mold, mildew, and fungus can grow on wood pallets, which can result in the production of mold spores which may contaminate or grow on materials being transported or which may cause adverse human health effects.

14.     In order to limit the growth of mold, mildew, or fungus, wood pallets may be treated with chemical treatments, such as ISK's pallet treatment products.

15.     A chemical which is used to prevent the growth of mold, mildew, or fungus is called a fungicide.

16.     Because the chemicals contained in fungicidal pallet treatment products may be toxic and have adverse health effects, these products are regulated under federal law by various agencies.

17.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* regulates the manufacturing, sale, and transportation of pesticides and fungicide products such as ISK's pallet treatment products and Defendants' WoodLock Bio-Shield product.

18.     FIFRA is administered and regulated by the Environmental Protection Agency.

19.     Under FIFRA, all fungicides must be registered by EPA, which requires submission of an application and approval by EPA.  7 U.S.C. § 136a.

20.     EPA maintains a Pesticide Product Label System ("PPLS") on its website containing all approved pesticides at https://iaspub.epa.gov/apex/pesticides/f?p=PPLS:1.

21.     ISK's pallet treatment products are registered with EPA under EPA Registration Numbers 1022-489-71581 (PQ-80®), 1022-583-71581 (NeXgen®), 1022-584-71581 (Tuff-Brite®), and 1022-595-71581 (PQ-8®).

22.     EPA regulations provide for an exemption (the "treated article exemption") under FIFRA for "[a]n article or substance treated with, or containing, a pesticide to protect the article or substance itself[.]" 40 C.F.R. § 152.25(a). The treated article exemption applies to the product being treated. It does not apply to the pesticide used to treat the product.

23.     This "treated article exemption" requires that the "pesticide is registered for such use." *Id.*

24.     Because wood pallets are also used for transportation of food products, their use in the transportation of foods is regulated by the Food & Drug Administration as a regulated indirect food additive.     *See* https://www.fda.gov/food/packaging-food-contact-substances-fcs/determining-regulatory-status-components-food-contact-material.

25.     FDA has a regulation regarding preservatives that may be safely used on wooden articles that are used or intended for use in packaging, transporting, or holding raw agricultural products when the amounts are necessary to protect the wood from mold and mildew. 21 C.F.R. § 178.3800. For example, this regulation allows for the use copper-8-quinolinolate, which is the active ingredient in ISK's PQ-80® and PQ-8® products, for treatment of wood pallets to be used for transportation of raw agricultural products.

## C.     Defendants' WoodLock Bio-Shield Product

26.     PMG markets WoodLock Bio-Shield Mold Inhibitor as a product to treat wood pallets for prevention of growth of mold or mildew on wood pallets.

27.     PMG markets products identified as "WoodLock Bio-Shield" (hereinafter, "Bio-Shield I"), "WoodLock Bio-Shield II" (hereinafter, "Bio-Shield II"), and WoodLock Bio-Shield H (hereinafter, "Bio-Shield H") under the name WoodLock Bio-Shield.

28.     Upon information and belief, the Safety Data Sheet ("SDS") is the only marketing material in which PMG and J&G distinguish among Bio-Shield I, Bio-Shield II, and Bio-Shield H.  Upon information and belief, the SDS for both Bio-Shield I and Bio-Shield H refer to the product as "WoodLock Bio-Shield" and do not distinguish among these products.

29.     Upon information and belief, PMG and J&G do not distinguish among Bio-Shield I, Bio-Shield II, and Bio-Shield H in any marketing material other than the SDS.

30.     Containers of WoodLock Bio-Shield contain J&G's contact information on the label.

31.     According to a SDS provided with Bio-Shield I, Bio-Shield I is manufactured by J&G Manufacturing LLC.

32.     According to a SDS provided with Bio-Shield II, Bio-Shield II is manufactured by J&G Manufacturing LLC.

33.     According to a SDS provided with Bio-Shield H, Bio-Shield H is manufactured by J&G Manufacturing LLC.

34.     The Globally Harmonized System of Classification and Labelling of Chemicals contains a standard specification for SDS used for chemical products, which includes first aid information, health and safety information, ecological information, and disposal instructions.

35.     In advertising, including but not limited to a Facebook post dated April 15, 2019, PMG tells customers to request a Material Safety Data Sheet for more information about its product.  *See* https://www.facebook.com/PalletMachineryGroup/posts/the-woodlock-bio-shield-

is-not-water-soluble-and-has-the-capability-of-thousands/2148012651941683/   (attached   as
Exhibit A).

### i.   Hazards of Bio-Shield I

36.     According to the SDS for Bio-Shield I, the active ingredient in Bio-Shield I is 3-iodo-2-propynl-Butyl Carbamate.  This ingredient is also known as Iodopropynl Butyl Carbamate ("IPBC").  The CAS number for IPBC is 55406-53-6.

37.     IPBC is not listed in FDA's regulation specifying preservatives that may be safely used on wooden articles that are used or intended for use in packaging, transporting, or holding raw agricultural products when the amounts are necessary to protect the wood from mildew.  21 C.F.R. § 178.3800.

38.     Under FDA rules and regulations, a company may submit a Food Contact Substance Notification ("FCN") which allows the product to be used for specific uses where the substance may come in contact with food.  21 U.S.C. § 378(h)(1)(C).

39.     An approved FCN only permits the substance to be used per the conditions of use for the specific FCN by that manufacturer, and is effective only for the manufacturer or supplier identified in the notification.

40.     Upon information and belief, there is no approved FCN for Bio-Shield I.

41.     Upon information and belief, Bio-Shield I is not registered as a pesticide with EPA.

42.     Bio-Shield I is not listed as a registered pesticide with EPA in the PPLS.

43.     Bio-Shield I is not listed among the over 280 pesticides in PPLS that contain IPBC.

44.     IPBC has been studied for adverse effects on humans, and has been found to have certain adverse effects, including irritation, sensitivity, and toxicity to various systems.

45.     For example, IPBC is known to be an irritant to the eyes and respiratory tract when aerosolized.          *See,*          *e.g.*,          https://onlinelibrary.wiley.com/doi/full/10.1002/3527600418.mb5540653kske5116.

46.     In addition, the application of IPBC to the skin at concentrations as high as 0.5% has been reported to cause skin sensitivity.  *See, e.g.*, https://journals.lww.com/dermatitis/Abstract/2013/09000/Positive_Patch_Test_Reactions_to_Carba_Mix_and.7.aspx.

47.     Various governmental agencies around the world have reviewed IPBC's safety. According to EPA studies, IPBC is nontoxic to slightly toxic to birds, and very highly toxic to highly toxic to freshwater fish and aquatic invertebrates.  *See,   e.g.*, https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/fs_PC-107801_4-Mar-99.pdf.

48.     According to a January 2015 European Union's Assessment Report of IPBC,  under Regulation (EU) No 582/2012, section 2.2, IPBC is "of moderate acute toxicity by the oral route and of low toxicity by the dermal route[]" and "is classified toxic by inhalation."  *See* https://echa.europa.eu/documents/10162/a937483c-be1c-4414-90b0-a1303d7d3465.

49.     In March 1997, EPA issued "minimum (baseline) personal protective equipment for occupational uses" of products containing IPBC, including that applicators and handlers wear "long-sleeve shirt and long pants, chemical-resistant gloves, shoes plus socks."  *See* https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/fs_PC-107801_4-Mar-99.pdf.

50.     Because IPBC is an eye irritant, goggles should be worn when chemicals containing IPBC are to be handled.

51.     On its website, EPA maintains a "Safer Chemical Ingredients List" which is "a list of chemical ingredients, arranged by functional-use, that the Safer Choice Program has evaluated and determined to be safer than traditional chemical ingredients."

52.     IPBC is not listed in EPA's Safer Chemical Ingredients List.

53.     Upon information and belief, no FDA regulation has identified IPBC as GRAS ("generally recognized as safe") for the purpose of treating wood pallets to be used to transport food products.

      **ii.     Hazards of Bio-Shield II and Bio-Shield H**

54.     According to the SDS for Bio-Shield II, the active ingredient in Bio-Shield II is octhilinone (2-octyle-4-isothiazolin-3-one).  The CAS number for octhilinone is 26530-20-1.

55.     According to the SDS for Bio-Shield H, the active ingredient in Bio-Shield H is octhilinone.

56.     Octhilinone is not listed in FDA's regulation specifying preservatives that may be safely used on wooden articles that are used or intended for use in packaging, transporting, or holding raw agricultural products when the amounts are necessary to protect the wood from mildew.  21 C.F.R. § 178.3800.

57.     Upon information and belief, Bio-Shield II is not registered as a pesticide with EPA.

58.     Bio-Shield II is not listed as a registered pesticide with EPA in the PPLS.

59.     Bio-Shield II is not listed among the over 130 pesticides in PPLS that contain octhilinone.

60.     Upon information and belief, Bio-Shield H is not registered as a pesticide with EPA.

61.     Bio-Shield H is not listed as a registered pesticide with EPA in the PPLS.

62.     Bio-Shield H is not listed among the over 130 pesticides in PPLS that contain octhilinone.

63.     The National Institutes of Health's PubChem database provides information to the public regarding octhilinone.  https://pubchem.ncbi.nlm.nih.gov/compound/Octhilinone

64.     The PubChem database entry for octhilinone indicates in the "Chemical Safety" section that it is Corrosive, Acute Toxic, Irritant, and Environmental Hazard.

65.     Octhilinone has been studied for adverse effects on humans, and has been found to have certain adverse effects, which are listed on PubChem.  Octhilinone is harmful if swallowed, toxic in contact with skin, causes severe skin burns and eye damage, may cause allergic skin reactions, and is toxic if inhaled.

66.     Because of these risks, octhilinone should only be handled with safety precautions such as the ones identified in Section 11.6.1 of the PubChem database, including but not limited to handling with gloves, wearing safety goggles and a faceshield, and body protection.

67.     PubChem provides specific first aid measures to be used if a person comes in contact with octhilinone, including eye contact, skin contact, inhalation, and ingestion.

68.     Octhilinone is also known to have a high toxicity to the environment.  In particular, octhilinone is very toxic to aquatic life and has long-lasting effects.

69.     No FDA regulation has identified octhilinone as GRAS ("generally recognized as safe") for any purpose.

70.     Under FDA rules and regulations, a company may submit a FCN which allows the product to be used for specific uses where the substance may come in contact with food.  21 U.S.C. § 378(h)(1)(C).

71.     An approved FCN only permits the substance to be used per the conditions of use for the specific FCN by that manufacturer, and is effective only for the manufacturer or supplier identified in the notification.

72.     There is no approved FCN for Bio-Shield II.

73.     There is no approved FCN for Bio-Shield H.

74.     The only two approved FCNs (Nos. 698 and 788) for octhilinone were submitted by Thor GmbH for use as a preservative in a latex emulsion to be used in manufacturing paper and paperboard.

75.     Any use of Bio-Shield II or Bio-Shield H does not fall within the scope of the Thor GmbH FCNs.

76.     Although octhilinone is listed on the EPA's Safer Chemicals List, it is listed therein with a yellow triangle.  *See* https://www.epa.gov/saferchoice/safer-ingredients.

77.     As EPA's website indicates, a yellow triangle means:

> ⚠ **Yellow triangle** - The chemical has met Safer Choice Criteria for its functional ingredient-class, but has some hazard profile issues. Specifically, a chemical with this code is not associated with a low level of hazard concern for all human health and environmental endpoints. (See Safer Choice Criteria). While it is a best-in-class chemical and among the safest available for a particular function, the function fulfilled by the chemical should be considered an area for safer chemistry innovation.

**D.     Defendants' False Statements Regarding WoodLock Bio-Shield**

78.     Defendants have been engaged in a years-long advertising and marketing campaign which has falsely and/or misleadingly represented both the safety of, environmental impact of, and regulatory status of WoodLock Bio-Shield.  For instance, Defendants have consistently advertised WoodLock Bio-Shield as a safe product that is exempt and/or lawful under EPA and FDA regulations and that has limited or no environmental impact.  In doing so, Defendants have made

numerous false and/or misleading claims throughout their advertising, as set forth in more detail below.

### i.   Defendants' Advertising Channels Generally

79.   Defendants maintain numerous channels to advertise and provide information regarding PMG.

80.   The advertising set forth below is exemplary, and sets forth numerous marketing channels through which Defendants have made numerous false and/or misleading statements regarding the safety and regulatory status of WoodLock Bio-Shield.  Upon information and belief, Defendants have repeated these false and/or misleading representations throughout their marketing and advertising.

81.   For example, PMG maintains a website with information regarding WoodLock Bio-Shield at https://www.palletmachinery.com/woodlock-bio-shield.

82.   PMG also maintains a Facebook page which contains information regarding WoodLock Bio-Shield at https://www.facebook.com/PalletMachineryGroup/.

83.   PMG's advertising informs consumers to request a Material Safety Data Sheet for more information about WoodLock Bio-Shield.  *See, e.g.*, Ex. A.

84.   Upon information and belief, PMG provides Safety Data Sheets to prospective consumers upon request.

85.   Upon information and belief, PMG also provides a Safety Data Sheet with purchases of WoodLock Bio-Shield.

86.   The Safety Data Sheet for Bio-Shield I (attached as Exhibit B) contains safety information regarding Bio-Shield I.

87.   The Safety Data Sheet for Bio-Shield II (attached as Exhibit C) contains safety information regarding Bio-Shield II.

88.     The Safety Data Sheet for Bio-Shield H (attached as Exhibit D) contains safety information regarding Bio-Shield H.

89.     Upon information and belief, the SDS for Bio-Shield I, Bio-Shield II, and Bio-Shield H are prepared and written by J&G.

90.     PMG places advertisements for WoodLock Bio-Shield in industry publications. For example, PMG placed an article entitled "Pallet Mold Season is Coming: Prepare to Protect" (attached as Exhibit E) in the March 2021 issue of Western Pallet Magazine.

91.     Western Pallet Magazine is a monthly internet magazine that is circulated by the Western Pallet Association, based in Camas, Washington.  Western Pallet Association's website indicates that it accepts advertisements for Western Pallet Magazine.

92.     Upon information and belief, PMG has placed additional advertisements or articles in pallet industry publications containing similar false statements as the ones identified below.

        **ii.     False Claims on PMG's Website**

93.     PMG's website contains numerous false and/or misleading statements regarding the safety and regulatory status of WoodLock Bio-Shield.

94.     As an example of various false claims, ISK identifies false claims made on the version of PMG's website in August 2019 as well as on the version of PMG's website in June 2021.

        **a)     PMG's Website in August 2019**

95.     Under the heading "The Safety Net," PMG's August 2019 website stated "WoodLock Bio-Shield is the Safest Product on the market.  It has no caustic properties.  This means everything from your tank to your nailing equipment is safe from harmful corrosion.  There are no known health hazards which keeps your operators in good health and minimizes injuries." (Ex. F.)

96.     As discussed above, both IPBC and octhilinone have numerous known health hazards.

97.     Upon information and belief, IPBC and octhilinone are not safer than any other fungicidal pallet treatment products.

98.     Under the heading "Woodlock Bio-Shield and the FDA", PMG's August 2019 website stated "WoodLock Bio-Shield is exempt from FDA Regulation.  What does this mean?  It means WoodLock is so safe it does not require regulation from the FDA.  And it's safe to touch food products."  (Ex. F.)

99.     As discussed above, FDA has regulations regarding treatment materials for wood pallets, and these materials are not exempt from FDA regulation.  These FDA regulations do not identify IPBC or octhilinone as a safe material for treatment of wood pallets for transportation of food.  Because IPBC and octhilinone have toxicity when ingested, it is not safe to use products containing these active ingredients on wood products which contact food.

100.    Under the heading "WoodLock Bio-Shield & The EPA", PMG's August 2019 website stated "WoodLock Bio-Shield is exempt from [FIFRA] registration under the 'Treated Articles Exemption' section 125.5(a) as it is considered a 'paint coating' whose ingredients are registered for this use and whose sole purpose is designed to protect the article or surface itself. Learn more at epa.gov/pesticides."  (Ex. F.)

101.    As discussed above, the "Treated Articles Exemption" only exempts materials treated with registered pesticides from being registered themselves.  WoodLock Bio-Shield is not exempt from FIFRA registration under this exemption.  WoodLock Bio-Shield is used to treat articles.  It is not a treated article itself.  The Treated Articles Exemption only applies to the articles treated, not to the chemicals used to treat those articles.

102.     As discussed above, Bio-Shield I, Bio-Shield II, and Bio-Shield H are all unregistered pesticides.

103.     Under FIFRA, "[t]he term 'pesticide' means (1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest." 7 U.S.C. § 136(u).  A fungus is a pest.  7 U.S.C. § 136(t).  By making claims that WoodLock Bio-Shield inhibits and controls mold and prevents mold spores, Defendants are making pesticidal claims for an unregistered pesticide.  (*See* Ex. F.)

104.     Under EPA regulations, this advertising is unlawful.  "FIFRA sections 12(a)(1) (A) and (B) make it unlawful for any person to 'offer for sale' any pesticide if it is unregistered, or if claims made for it as part of its distribution or sale differ substantially from any claim made for it as part of the statement required in connection with its registration under FIFRA section 3. EPA interprets these provisions as extending to advertisements in any advertising medium to which pesticide users or the general public have access." 40 C.F.R. § 168.22(a).

105.     40 C.F.R. § 168.22(b)(4) explains that "EPA regards it as unlawful for any person who distributes, sells, offers for sale, holds for sale, ships, delivers for shipment, or receives and (having so received) delivers or offers to deliver any pesticide, to place or sponsor advertisements which recommend or suggest the purchase or use of: . . . [a]ny unregistered pesticide for any use unless the advertisement is one permitted by paragraph (b) (2) or (3) of this section."

106.     Upon information and belief, WoodLock Bio-Shield is not authorized for uses that would permit advertisement of WoodLock Bio-Shield under 40 C.F.R. § 168.22(b)(2) or (3).

107.     By advertising an unregistered pesticide that is required to be registered as a pesticide exempt from EPA registration, Defendants make false and misleading claims about their product.

**b)   PMG's Website in June 2021**

108.   Under the heading "General Information", PMG's June 2021 website states that it is "[s]afe for indirect and incidental food contact on wood pallets (FDA GRAS)" and "Non-Caustic[.]" (*See* Ex. G.)

109.   As discussed above, IPBC and octhilinone are known to cause skin irritation.

110.   As discussed above, FDA regulations do not identify IPBC or octhilinone as a safe material for treatment of wood products used for transportation of food.

111.   FDA has not approved or otherwise determined IPBC or octhilinone as safe for purposes of treatment of wood products used for transportation of food.

112.   IPBC is only identified as safely used as an adhesive for purposes of packaging, transporting, and holding foods under specific conditions as an antifungal under 21 C.F.R. § 175.105.

113.   Upon information and belief, octhilinone has not been identified as safe for any purposes by FDA.

114.   This statement is false and/or misleading regarding IPBC because even if IPBC has been approved as GRAS for limited purposes, it has not been approved as GRAS for the purpose of treating wood pallets to be used to transport food products, which is the advertised use of Bio-Shield I.

115.   This statement is false and/or misleading regarding octhilinone because even if two FCNs have been approved, their approval does not apply to the uses for which Bio-Shield II and Bio-Shield H are advertised.

**iii.   PMG's Facebook Page**

116.   PMG uses its Facebook page to advertise for products and services, including WoodLock Bio-Shield.

117.    On April 15, 2019, PMG made a post on its Facebook page regarding WoodLock Bio-Shield.  (Ex. A.)

118.    The Facebook post contains numerous false and/or misleading statements regarding the safety and regulatory status of WoodLock Bio-Shield.

119.    PMG's post states that WoodLock Bio-Shield "is a proven EPA registered product."

120.    WoodLock Bio-Shield is not registered with EPA.

121.    PMG's post states "WoodLock is not a fungicide[.]"

122.    The active ingredients in Bio-Shield I, II and H are fungicides, and WoodLock Bio-Shield is intended to be used as a fungicide on wood pallets.

123.    Wood-Lock Bio-Shield makes pesticidal claims when it advertises that WoodLock Bio-Shield inhibits mold.  (Ex. A.)  It is a violation of FIFRA to advertise an unregistered pesticide. 40 C.F.R. § 168.22.

124.    PMG's post states that WoodLock Bio-Shield "is safe to use on GMA [Grocery Manufacturers Association] and food pallets.  For further information about this, please request a Material Safety Data Sheet."

125.    As discussed above, IPBC and octhilinone have toxicity when ingested.

126.    As discussed above, neither IPBC nor octhilinone is approved or otherwise determined as safe for purposes of treatment of wood products used for transportation of food.

iv.    **Advertisements in Industry Publications**

127.    The March 2021 issue of Western Pallet Magazine contains an article advertising WoodLock Bio-Shield.  (Ex. E.)

128.    The article contains numerous false and/or misleading statements regarding WoodLock Bio-Shield.

129.    The article states "WoodLock is formulated with active ingredients which are on the EPA Safer Alternative List and are listed as FDA GRAS (Generally Regarded as Safe)."  (Ex. E.)

130.    As discussed above, IPBC is not on the EPA Safer Chemicals List.

131.    As discussed above, although octhilinone is listed on EPA's Safer Chemicals List, it is listed with a yellow triangle status which indicates certain hazards.  The March 2021 article does not inform the reader of this status.

132.    As discussed above, IPBC is only identified as safely used as an adhesive for purposes of packaging, transporting, and holding foods under specific conditions as an antifungal under 21 C.F.R. § 175.105.  FDA has not approved or otherwise determined IPBC as safe for purposes of treatment of wood products used for transportation of food.

133.    Upon information and belief, no FDA regulation or rule has identified octhilinone as GRAS for any purpose.

134.    The article states "[t]he formula contains no hazardous materials or carcinogens and is non-flammable and non-corrosive."  (Ex. E.)

135.    As discussed above, IPBC has been determined to be toxic under certain circumstances.  IPBC is hazardous to humans if inhaled or ingested, and it may cause skin irritation when it makes contact with the skin.

136.    As discussed above, octhilinone has health hazards including toxicity if ingested or inhaled, damage to eyes, and skin irritation.

137.    The article states that "WoodLock requires no additional safety precautions and can be used indoors and/or around sparking machinery."

138.    As discussed above, EPA has issued guidance requiring specific safety precautions for use of products containing IPBC.

139.    Specific safety precautions, including but not limited to gloves, long sleeves, and eye protection should be used with IPBC products.

140.    As discussed above, PubChem identifies certain safety precautions that should be taken when using products containing octhilinone, including gloves, eye protection, and body protection.

141.    The article states "[e]mpty WoodLock containers can be recycled in standard municipal recycling streams, no special disposal protocols required."  (Ex. E.)

142.    This statement is false and/or misleading.   As discussed above, IPBC and octhilinone are toxic to at least aquatic creatures.  By stating that containers require no special disposal protocols and that containers may be recycled in standard recycling streams, this suggests that these products are nontoxic and have no environmental impact.

143.    On February 9, 2021, an advertisement was posted on the Southeastern Lumber Manufacturers   Association's   website   regarding   WoodLock   Bio-Shield   at https://www.slma.org/blog/welcome-woodlock-bio-shield (attached as Ex. H).

144.    The Southeastern Lumber Manufacturers Association is an association "representing solid sawn lumber lumber *[sic]* manufacturers throughout the southeast." https://www.slma.org/about-us.  The Southeastern Lumber Manufacturers Association includes members in 17 states, including the Commonwealth of Virginia and the Eastern District of Virginia. *Id.*

145.    The SLMA website posting states that WoodLock Bio-Shield is "exempt from FIFRA and EPA GRAS" and is "safe for employees . . . and the environment[.]"

146.   These claims are identical to the claims made in the Western Pallet Magazine article, and are false and/or misleading for the same reasons.

147.   An advertisement was placed in the April 2021 issue of Timber Processing Magazine, which contains similar or identical false and/or misleading statements.

148.   Timber Processing Magazine is a publication "focus[ing] on sawmill project installations in the softwood and hardwood lumber industry in North America and worldwide." https://www.timberprocessing.com/about/.

149.   An advertisement was placed in the April 2021 issue of American Lumber & Pallet, which contains similar or identical false and/or misleading statements.

150.   American Lumber & Pallet is a mailing that is "[m]ailed **FREE** to Sawmills, Pallet Operations, Woodworkers, Veneer & Chip Mills and Loggers with portable sawmills in the U.S." https://amlumber.com/about.

151.   An advertisement attached as Exhibit I was placed in the August 2020 edition of Pallet Enterprise.  *See also* https://www.palletenterprise.com/3d/august2020/index.html?page=31.

152.   Pallet Enterprise Magazine's website states that it is "[f]or almost 40 years the leading pallet and sawmill magazine in America."  https://www.palletenterprise.com/.

153.   The Pallet Enterprise advertisement falsely and/or misleadingly states that WoodLock Bio-Shield is "FDA (GRAS - Generally Recognized as Safe)[,]" has a "Safe Non-Caustic Formula[,]" and that "Active Ingredients [are] on EPA 'Safer Alternatives' List."  Ex. H.

154.   An advertisement attached as Exhibit J was placed in the May-June 2020 edition of Pallet Central magazine.

155.   Pallet Central Magazine is published by the National Wooden Pallet & Container Association.  The National Wooden Pallet & Container Association states that it "is the largest

organization of wood packaging professionals in the world, with more than 670 company members in 28 countries who manufacture, repair and distribute pallets and wood packaging in unit-load solutions, or who supply products and services to the industry." https://www.palletcentral.com/page/AboutUs.

156.    The Pallet Central advertisement states that "WoodLock Bio-Shield Mold Inhibitor is safe for employees and machinery."  As discussed in detail above, this statement is false and/or misleading because the active ingredients in WoodLock Bio-Shield are hazardous and therefore employees must use safety equipment when handling WoodLock Bio-Shield.

157.    Upon information and belief, Defendants have placed advertisements containing similar or identical false and/or misleading statements regarding WoodLock Bio-Shield in numerous industry publications.

**v.    The SDS for Bio-Shield I**

158.    The SDS provided for Bio-Shield I (attached as Ex. B) contains false and/or misleading statements, as well as omissions of critical information, regarding the safety and environmental impact of Bio-Shield I and its active ingredients.

159.    As discussed in detail above, IPBC is known to have toxicity when inhaled or ingested and causes eye, throat, and skin irritation.  In addition, IPBC is toxic to aquatic animals.

160.    The SDS does not disclose this information, and falsely claims that IPBC is safe, nontoxic, has no health effects, and that no safety measures need to be taken during disposal for environmental or ecological protection.

161.    In Section II, entitled Hazards Identification, the SDS states that there are no effects and symptoms of either acute or chronic exposure.

162.    In Section IV, entitled First Aid Measures, the SDS states that no first aid measures are required and that no acute health effects are expected.

163.    In Section VIII, entitled Exposure Controls / Personal Protection, the SDS states "None Required" for Respiratory Protection and Special Ventilation Requirements, Other Protective Equipment (Gloves, Googles, etc.), Work/Hygiene Practices, and Engineering Controls.

164.    In Section XII, entitled Ecological Information, the SDS states "no harmful effects known other than those associated with suspended inert solids in water."

165.    In Section XIII, entitled Disposal Considerations, the SDS states "Waste Disposal Method: Dispose of in accordance with federal, state and local regulations."  This is false and/or misleading because the SDS does not properly classify Bio-Shield I, so the consumer will not be able to determine the appropriate regulations for disposal.   Because of this misclassification, any residual IPBC in the containers can cause environmental damage, as a consumer may not be aware that measures should be taken during disposal to ensure no IPBC enters the environment.

### vi.    The SDS for Bio-Shield II

166.    The SDS provided for Bio-Shield II (attached as Ex. C) contains false and/or misleading statements, as well as omissions of critical information, regarding the safety of Bio-Shield II and its active ingredients.

167.    As discussed in detail above, octhilinone is known to be toxic, corrosive, and irritating to humans when in contact.  In addition, octhilinone is highly toxic to aquatic animals.

168.    The SDS does not disclose this information, and falsely claims that octhilinone is safe, nontoxic, has no health effects, and that no safety measures need to be taken during disposal for environmental or ecological protection.

169.    In Section II, entitled Hazards Identification, the SDS states that there are no effects and symptoms of either acute or chronic exposure.

170.    In Section IV, entitled First Aid Measures, the SDS states that no first aid measures are required and that no acute health effects are expected.

171.    In Section VIII, entitled Exposure Controls / Personal Protection, the SDS states "None Required" for Respiratory Protection and Special Ventilation Requirements, Other Protective Equipment (Gloves, Googles, etc.), Work/Hygiene Practices, and Engineering Controls.

172.    In Section XII, entitled Ecological Information, the SDS states "no harmful effects known other than those associated with suspended inert solids in water."

173.    In Section XIII, entitled Disposal Considerations, the SDS states "Waste Disposal Method: Dispose of in accordance with federal, state and local regulations."  This is false and/or misleading because the SDS does not properly classify Bio-Shield II, so the consumer will not be able to determine the appropriate regulations for disposal.  Because of this misclassification, any residual octhilinone in the containers can cause environmental damage, as a consumer may not be aware that measures should be taken during disposal to ensure no octhilinone enters the environment.

### vii.    The SDS for Bio-Shield H

174.    The SDS provided for Bio-Shield H (attached as Ex. D) contains false and/or misleading statements, as well as omissions of critical information, regarding the safety of Bio-Shield H and its active ingredients.

175.    As discussed in detail above, octhilinone is known to be toxic, corrosive, and irritating to humans when in contact.  In addition, octhilinone is highly toxic to aquatic animals.

176.    The SDS does not fully disclose this information, and does not explain all safety measures that need to be taken during handling or during disposal for environmental or ecological protection.

177.    In Section II, entitled Hazards Identification, the SDS states that only mild eye and skin irritation can occur via acute exposure.  But as discussed above, octhilinone can cause severe

skin burns and severe eye damage, and may be corrosive to skin.  The SDS omits this information, and therefore misleads consumers about the potential impact of contact with octhilinone.

178.    In Section IV, entitled First Aid Measures, the SDS states that no first aid measures are required and that no acute health effects are expected.

179.    In Section VIII, entitled Exposure Controls / Personal Protection, the SDS states "None Required" for Respiratory Protection and Special Ventilation Requirements, and does not indicate any specific skin protection that should be used except "as required" to prevent contact. This is false and/or misleading, as the risk of severe skin burns and corrosion upon contact would require additional protective equipment for the skin.

180.    In Section XII, entitled Ecological Information, the SDS states "no harmful effects known other than those associated with suspended inert solids in water."

181.    In Section XIII, entitled Disposal Considerations, the SDS states "Waste Disposal Method: Dispose of in accordance with federal, state and local regulations."  This is false and/or misleading because the SDS does not properly classify Bio-Shield H, so the consumer will not be able to determine the appropriate regulations for disposal.  Because of this misclassification, any residual octhilinone in the containers can cause environmental damage, as a consumer may not be aware that measures should be taken during disposal to ensure no octhilinone enters the environment.

### viii.    Advertising Presentation

182.    On June 6, 2018, PMG published an advertising presentation regarding WoodLock Bio-Shield, which is available online at https://prezi.com/p/dms1q2qdsupp/woodlock/.   This presentation makes numerous false or misleading claims regarding Bio-Shield.

183.    On slide 3, the presentation states that WoodLock Bio-Shield "deliver[s] time-tested proven EPA registered products in ultra low doses."

184.    This claim is false and/or misleading because WoodLock Bio-Shield is not registered with EPA.

185.    On slide 11, the presentation states that WoodLock Bio-Shield is exempt from FIFRA registration under the Treated Articles Exemption.

186.    As discussed above, this claim is false and/or misleading because WoodLock Bio-Shield is not exempt from FIFRA registration as a treated article.

**E.      The Resulting Harm to ISK**

187.    As a result of Defendants' false and misleading representations about WoodLock Bio-Shield and its safety, environmental impact, and regulatory status, consumers will purchase WoodLock Bio-Shield instead of ISK's pallet treatment products.

188.    Consumers are likely to be deceived and, upon information and belief, are actually being deceived regarding Defendants' false and misleading representations about WoodLock Bio-Shield's safety, environmental impact, and regulatory status.

189.    Upon information and belief, Defendants know or should have known that their representations about WoodLock Bio-Shield's safety, environmental impact, and regulatory status are false and misleading and will cause consumers to purchase WoodLock Bio-Shield instead of other competing products, including ISK's pallet treatment materials.

190.    Upon information and belief, Defendants have engaged in false advertising and marketing willfully or recklessly.

191.    Through these and other false and misleading representations, Defendants have and will continue to harm ISK's sales of its pallet treatment materials and have caused and will continue to cause ISK to lose both revenue and market share.

## COUNT I

### False Advertising Under the Lanham Act – 15 U.S.C. § 1125(a)

192.    ISK repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

193.    Upon information and belief, in the course of advertising and marketing WoodLock Bio-Shield, Defendants have used, in interstate commerce and in commercial advertising, false and misleading representations of fact that misrepresent the safety, environmental impact, and regulatory status of WoodLock Bio-Shield.

194.    These false and misleading representations include, but are not limited to, the representations identified in Sections D.ii–D.viii above.

195.    Upon information and belief, Defendants' representations about WoodLock Bio-Shield to consumers and the pallet industry constitute commercial advertising or promotion.

196.    Defendants' misrepresentations about WoodLock Bio-Shield relate to the nature, characteristics, and/or qualities of WoodLock Bio-Shield.

197.    Defendants' false and misleading representations are material in that they are likely to influence the purchasing decisions of consumers in the wood pallet industry.

198.    Defendants' representations about WoodLock Bio-Shield have deceived and/or have the tendency to deceive a substantial segment of its intended audience.

199.    Upon information and belief, but for Defendants' false and misleading statements, consumers in the wood pallet industry would not purchase WoodLock Bio-Shield.

200.    Upon information and belief, Defendants' actions have been willful and deliberate.

201.    As a direct and proximate result of Defendants' actions, ISK has and will continue to suffer damage to its business, reputation, goodwill, and the loss of sales, profits, and customers.

202.    Defendants' actions as alleged herein have caused, are causing, and will continue

to cause irreparable and inherently unquantifiable injury and harm to ISK's business, reputation, and goodwill, unless enjoined by this Court.

203.    Pursuant to 15 U.S.C. § 1116, ISK is entitled to preliminary and permanent injunctive relief to Defendants' continuing acts.

204.    Pursuant to 15 U.S.C. § 1117, ISK is entitled to recover treble damages sustained by Defendants' actions, an accounting for profits realized by Defendants, and the costs of this action.

205.    In addition, as this is an exceptional case pursuant to 15 U.S.C. § 1117(a), ISK is entitled to an award of reasonable attorney's fees.

## COUNT II

**Contributory False Advertising under the Lanham Act - 15 U.S.C. § 1125(a)**

206.    ISK repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

207.    Upon information and belief, Defendants are knowingly inducing or causing, and/or materially participating in, the false and misleading advertising and promotion of WoodLock Bio-Shield in industry publications, including but not limited to Western Pallet magazine, regarding WoodLock Bio-Shield's safety, environmental impact, and regulatory status.

208.    Further, upon information and belief, J&G is knowingly inducing or causing, and/or materially participating in, the false and misleading advertising and promotion of WoodLock Bio-Shield, including but not limited to the distribution of the SDS with false and/or misleading statements.

209.    Upon information and belief, Defendants knew and/or intended to participate in the false advertising of WoodLock Bio-Shield by industry publications.

210.    Further, upon information and belief, J&G knew and/or intended to participate in

the false advertising of WoodLock Bio-Shield via the distribution of the SDS.

211.    Defendants actively and materially furthered such false and misleading advertising and promotion of WoodLock Bio-Shield by industry publications by purchasing and writing advertisements which falsely and misleadingly represented WoodLock Bio-Shield's safety, environmental impact, and regulatory status.

212.    Upon information and belief, J&G actively and materially furthered such false and misleading advertising and promotion of WoodLock Bio-Shield by preparing the SDS and providing it to PMG for distribution during advertising and sales.

213.    Such false and misleading representations about WoodLock Bio-Shield in industry publications and the SDS have actually deceived or have the tendency to deceive a substantial segment of their audience as to the nature, quality, and/or characteristics of WoodLock Bio-Shield.

214.    Such false and misleading representations about WoodLock Bio-Shield in industry publications and the SDS are material and likely to influence the purchasing decisions of consumers in the wood pallet industry.

215.    Upon information and belief, these false or misleading representations were and are made in interstate commerce.

216.    Upon information and belief, Defendants' actions have been willful and deliberate.

217.    As a direct and proximate result of Defendants' conduct, ISK has suffered damages, which includes a loss of reputation, sales, profits and customers.

218.    Defendants' actions as alleged herein have caused, are causing, and will continue to cause irreparable and inherently unquantifiable injury and harm to ISK's business, reputation, and goodwill, unless Defendants' unlawful conduct is enjoined by this Court.

219.    Pursuant to 15 U.S.C. § 1116, ISK is entitled to preliminary and permanent

injunctive relief to Defendants' continuing acts.

220.    Pursuant to 15 U.S.C. § 1117, ISK is entitled to recover treble damages sustained by Defendants' actions, an accounting for profits realized by Defendants, and the costs of this action.

221.    In addition, as this is an exceptional case pursuant to 15 U.S.C. § 1117(a), ISK is entitled to an award of reasonable attorney's fees.

<u>**COUNT III**</u>

**Unfair Competition Under the Lanham Act – 15 U.S.C. § 1125(a)**

222.    ISK repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

223.    By virtue of Defendants' false or misleading representations, as detailed above, Defendants are also liable for unfair competition under the Lanham Act.

224.    Defendants' false and/or misleading representations of fact are likely to cause confusion or mistake or to deceive as to WoodLock Bio-Shield's approval by EPA and FDA.

225.    Consumers may be deceived into believing that WoodLock Bio-Shield has been authorized by EPA or FDA.

226.    ISK is likely to be and has been damaged by Defendants' conduct, as detailed herein.  ISK is entitled to damages for Defendants' unfair competition, an accounting of profits and recovery of ISK's costs of this action.

227.    Because Defendants' conduct is causing irreparable and inherently unquantifiable injury and harm to ISK's business, reputation, and goodwill, ISK is entitled to temporary, preliminary, and permanent injunctive relief, enjoining Defendants from further unfair competition, including without limitation, removing the false and misleading statements regarding WoodLock Bio-Shield's regulatory status.

228.     Pursuant to 15 U.S.C. § 1117, ISK is entitled to recover treble damages sustained by Defendants' actions, an accounting for profits realized by Defendants, and the costs of this action.

229.     In addition, as this is an exceptional case pursuant to 15 U.S.C. § 1117(a), ISK is entitled to an award of reasonable attorney's fees.

## COUNT IV

### Violation of the Virginia Consumer Protection Act

230.     ISK repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

231.     Va. Code § 59.1-204 provides a private right of action to enforce the provisions of Va. Code § 59.1-200.

232.     In the course of its business, Defendants have engaged and continue to engage in deceptive trade practices in violation of at least Va. Code §§ 59.1-200(2), (5), (6), and (14) by and through their false and misleading representations of fact and conduct with respect to WoodLock Bio-Shield.

233.     Upon information and belief, Defendants have willfully engaged in these actions knowing them to be deceptive.

234.     By reason of Defendants' actions, ISK has and will continue to suffer damage to their business, reputation, and goodwill and the loss of sales and profits.

235.     Pursuant to Va. Code §§ 59.1-204, ISK is entitled to treble damages, injunctive relief, and reasonable attorney's fees.

## COUNT V

### Common Law Unfair Competition

236.     ISK repeats and re-alleges the allegations contained in the preceding paragraphs of

this Complaint as though set forth fully herein.

237.   Defendants have intentionally and maliciously made false statements and material omissions in their marketing and sale of WoodLock Bio-Shield.

238.   Through these actions, as described above, Defendants have wrongfully interfered with ISK's reasonable business expectancies concerning its pallet treatment products, including expected sales.

239.   By reason of Defendants' actions, ISK has and will continue to suffer damage to their business, reputation, and goodwill and the loss of sales and profits.

240.   ISK is entitled to damages for Defendants' unfair competition, an accounting of profits made on sales of WoodLock Bio-Shield and recovery of ISK's costs of this action.

241.   Defendants knew or should have known that their conduct was reasonably likely to result in injury, damage or other harm, thus warranting the award of punitive damages.

242.   In addition, Defendants' conduct is causing irreparable and inherently unquantifiable injury and harm to ISK's business, reputation, and goodwill and the reputation of their products that cannot be adequately compensated by monetary damages.  Hence, ISK is also entitled to temporary, preliminary, and permanent injunctive relief, enjoining Defendants' from further marketing and sales of the products at issue.

## **PRAYER FOR RELIEF**

WHEREFORE, ISK prays:

A.   That Defendants be required to account to ISK for any and all profits derived from the sale of WoodLock Bio-Shield and to compensate ISK for all damages sustained by ISK through the acts complained of herein;

B.   That this Court award compensatory, treble, punitive, and exemplary damages in

favor of ISK, including general and specific damages, in an amount to be proven at trial;

C.      That this Court order Defendants to engage in corrective advertising to correct all misrepresentations identified herein;

D.      That this Court grant temporary, preliminary, and permanent injunctive relief that requires Defendants, and all others acting in privity or in concert with them, to cease making false and misleading representations concerning the product at issue;

E.      That the costs of this action be awarded to ISK;

F.      That ISK be awarded costs and its reasonable attorney's fees as provided by § 35(a) of the Lanham Act, 15 U.S.C. § 1117, and Virginia law;

G.      That this Court grant all other relief to which ISK may reasonably be entitled under their causes of action; and

H.      That this Court grant such other and further relief as it shall deem just, equitable and proper.

Dated: June 15, 2021

Respectfully submitted,

ISK BIOCIDES, INC.

By: /s/ Bassam N. Ibrahim
Bassam N. Ibrahim (VA Bar No. 43353)
S. Lloyd Smith (VA Bar No. 85119)
Brian H. Gold (VA Bar No. 87569)
BUCHANAN INGERSOLL & ROONEY PC
1737 King Street, Suite 500
Alexandria, Virginia 22314
Tel.:    (703) 836-6620
Fax:    (703) 836-2021
bassam.ibrahim@bipc.com
lloyd.smith@bipc.com
brian.gold@bipc.com

*Attorneys for Plaintiffs*