IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ISK BIOCIDES, INC.,
          Plaintiff,

v.                                           Civil Action No. 3:21-cv-386

PALLET MACHINERY GROUP INC.
& J&G MANUFACTURING LLC,
          Defendants.

## OPINION

The plaintiff ISK Biocides, Inc. ("ISK"), and the defendants Pallet Machinery Group Inc. ("PMG"), and J&G Manufacturing LLC ("J&G"), manufacture and sell wood protection products. ISK, a competitor of PMG and J&G (collectively, "the defendants"), accuses the defendants of making false representations about WoodLock Bio-Shield Mold Inhibitor, the defendants' line of wood protection products. Specifically, ISK alleges that the defendants have misrepresented the safety, environmental impact, and regulatory status of WoodLock Bio-Shield products in violation of the Lanham Act, 15 U.S.C. §§ 1051–1141n, which protects businesses against unfair competition (Counts I–III), the Virginia Consumer Protection Act ("VCPA"), Va. Code §§ 59.1-196 through 59.1-207 (Count IV), and Virginia common law (Count V).

The defendants move to dismiss ISK's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 17.) The Court will grant in part and deny in part this motion. Because ISK sufficiently alleges that it has suffered an injury caused by material, false statements the defendants either made or caused each other to make in publicly disseminated advertisements, the Court will deny the motion as to ISK's false advertising claim (Count I) and contributory false

advertising claim (Count II). The Court will also deny the motion as to ISK's false association[1] claim (Count III); the defendants' advertisements falsely indicated authorization and approval by the United States Environmental Protection Agency ("EPA"). Finally, the Court will dismiss both of ISK's state law claims (Counts IV & V) because ISK lacks standing to sue under the VCPA, and Virginia common law does not protect against false advertising.

## I. FACTS ALLEGED IN THE COMPLAINT

Wood pallets "are widely used throughout" our country's supply chain. (ECF No. 1 ¶ 12.) Without adequate protection, these pallets risk growing mold, mildew, and fungus, jeopardizing the materials that the pallets transport and posing health risks to those handling the pallets. To prevent this sort of growth, many who use pallets treat them with chemicals called fungicides.

The defendants market, promote, distribute, and sell these sorts of fungicides. J&G manufactures the WoodLock Bio-Shield products that PMG sells. WoodLock Bio-Shield products include Bio-Shield I, Bio-Shield II, and Bio-Shield H.[2]

Both the United States Food & Drug Administration ("FDA") and the EPA regulate fungicides applied to wood pallets. The FDA regulates the fungicides "[b]ecause wood pallets are also used for transportation of food products." (ECF No. 1 ¶ 24.)

The EPA, however, assumes the bulk of the regulatory duties of this area through its

---

[1] In its brief in opposition to the defendants' motion, ISK clarifies that it brings Count III under 15 U.S.C. § 1125(a)(1)(A), which creates a right of action for false association. (ECF No. 19, at 15.) Although ISK's complaint titles Count III "Unfair Competition," (ECF No. 1 ¶¶ 222–29), the Court will refer to Count III through this Opinion as a claim for false association.
In its brief, ISK cites 15 U.S.C. § 1115(a)(1)(A). Because no such provision exists and based on the complaint and its context, the Court concludes that ISK intended to cite 15 U.S.C. § 1125(a)(1)(A).

[2] Although these products include different hazardous ingredients, (see ECF Nos. 1-2; 1-3; 1-4), most of the marketing materials at issue do not distinguish between these products.

2

administration of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). FIFRA requires that before selling or distributing any fungicide, the "fungicide[] must be registered by [the] EPA, which requires submission of an application and approval by [the] EPA." (*Id.* ¶ 19); 7 U.S.C. §§ 136, 136a (explaining that a fungicide qualifies as a pesticide, which FIFRA defines as "any substance . . . intended for preventing, destroying, repelling, or mitigating any pest," including fungus). The EPA maintains a list of all approved pesticides.

WoodLock Bio-Shield I includes one hazardous ingredient: 3-iodo-2-propyl-butyl carbamate ("IPBC").[3] (ECF No. 1-2.) Even at a concentration of 0.5%, IPBC "has been found to have certain adverse effects" on humans, "including irritation, sensitivity, and toxicity to various systems." (ECF No. 1 ¶ 44.) Thus, the EPA advises that those who handle products containing IPBC wear personal protective equipment such as "long-sleeve shirt[s] and long pants, chemical-resistant gloves, [and] shoes plus socks." (*Id.* ¶ 49 (quoting *EPA R.E.D. Facts: IPBC*, https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/fs_PC-107801_4-Mar-99.pdf) (last visited on Dec. 21, 2021).) In addition, IPBC "is not listed on EPA's Safer Chemical Ingredients List," a list "of chemical ingredients" that the EPA "has evaluated and determined to be safer than traditional chemical ingredients." (*Id.* ¶¶ 51–52.)

WoodLock Bio-Shield II and WoodLock Bio-Shield H contain a different hazardous

---

[3] ISK alleges that "the active ingredient in Bio-Shield I is" IPBC. (ECF No. 1 ¶ 36.) ISK makes this deduction from the Safety Data Sheet ("SDS") produced by J&G. ISK offers no other allegations that support this deduction. But the SDS lists IPBC as a hazardous ingredient, *not* the active ingredient in WoodLock Bio-Shield I. (ECF No. 1-2, at 1.) The Court, therefore, does not accept the allegation that IPBC acts as an active ingredient in WoodLock Bio-Shield I. *See Moseley v. Price*, 300 F. Supp. 2d 389, 395 (E.D. Va. 2004) ("[C]ourts need not accept 'unwarranted inferences' or 'unwarranted deductions' made by a plaintiff in his complaint when deciding a motion to dismiss." (quoting *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000))).

ingredient: 2-octyle-4-isothiazoline-3-one ("OIT").[4] (ECF Nos. 1-3; 1-4.) OIT "has [also] been found to have certain adverse effects" on humans. (ECF No. 1 ¶ 65.) For instance, OIT "is harmful if swallowed, toxic in contact with skin, causes severe skin burns and eye damage, may cause allergic skin reactions, and is toxic if inhaled." (*Id.*) As a result, people handling products containing OIT should wear gloves, safety goggles, a face shield, and body protection. (*Id.* ¶ 66 (citing *Octhilinone*, PubChem: Nat'l Libr. of Med., https://pubchem.ncbi.nlm.nih.gov/compound/33528 (last visited on Dec. 20, 2021)). Although OIT makes it on the Safer Chemical Ingredients List, the EPA notes that OIT "is not associated with a low level of hazard concern for all human health and environmental endpoints." (*Id.* ¶¶ 76–77.)

Finally, none of the WoodLock Bio-Shield products are registered as pesticides with the EPA.

\* \* \*

The defendants advertise WoodLock Bio-Shield products through "numerous channels," including PMG's website and Facebook page as well as various industry publications. (*Id.* ¶ 79.) These advertisements "inform[] customers to request a[n] [SDS]" for WoodLock Bio-Shield products. (*Id.* ¶ 83; *see* ECF Nos. 1-2; 1-3; 1-4.) J&G prepares the SDSs. The plaintiff challenges various advertisements, including:

---

[4] ISK alleges that OIT acts as "the active ingredient in Bio-Shield II" and Bio-Shield H. (*Id.* ¶¶ 54, 55.) ISK makes this deduction from the SDSs produced by J&G. And ISK offers no other allegations that support this deduction. But the SDSs list OIT as a hazardous ingredient, *not* the active ingredient in WoodLock Bio-Shield II and WoodLock Bio-Shield H. (ECF Nos. 1-3, at 1; 1-4, at 1.) The Court, therefore, does not accept the allegation that OIT acts as an active ingredient in either WoodLock Bio-Shield II or WoodLock Bio-Shield H. *See Moseley*, 300 F. Supp. 2d at 395 ("[C]ourts need not accept 'unwarranted inferences' or 'unwarranted deductions' made by a plaintiff in his complaint when deciding a motion to dismiss." (quoting *E. Shore Mkts., Inc.*, 213 F.3d at 180)).

### A. PMG's Website

1. "WoodLock Bio-Shield is the Safest Product on the market. It has no caustic properties. This means everything from your tank to your nailing equipment is safe from harmful corrosion. There are no known health hazards which keeps your operators in good health and minimizes injuries." (ECF Nos. 1 ¶ 95; 1-6.)

### B. PMG's Facebook Page

2. "WoodLock Bio-Shield 'is a proven EPA registered product.'" (ECF Nos. 1 ¶ 119; 1-1.)

### C. Advertisement in an Industry Publication

Pallet Central Magazine:[5]

3. "WoodLock Bio-Shield Mold Inhibitor is safe for employees and machinery." (ECF Nos. 1 ¶ 156; 1-10.)

### E. The SDSs for WoodLock Bio-Shield Products

The SDSs for Bio-Shield I, II, and H:

4. No personal protection or exposure controls are required. (ECF Nos. 1 ¶¶ 163, 171, 178; 1-2; 1-3; 1-4.)

\*   \*   \*

According to ISK, these "false and misleading representations about WoodLock Bio-Shield and its safety, environmental impact, and regulatory status" will cause consumers to "purchase WoodLock Bio-Shield instead of ISK's pallet treatment products." (ECF No. 1 ¶ 187.)

---

[5] National Wood Pallet & Container Association, an entity with more than "670 company members in 28 countries," publishes Pallet Central Magazine. (ECF No. 1 ¶ 155.)

## II. DISCUSSION[6]

The defendants move to dismiss all five counts of ISK's complaint: the three Lanham Act claims for false advertising (Count I), contributory false advertising (Count II), and false association (Count III), and the two state law claims for violating the VCPA (Count IV) and Virginia common law (Count V).

### *A. Lanham Act (Counts I–III)*

The Lanham Act governs trademarks, service marks, and unfair competition. *See* 15 U.S.C. §§ 1051–1141n. "[U]nfair competition under the Lanham Act is a category of claims" created by 15 U.S.C. § 1125(a). *Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 272 (E.D.N.Y. 2014). Section 1125(a) provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

---

[6] The defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion gauges the sufficiency of a complaint without resolving any factual discrepancies or testing the merits of the claims. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering the motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

The principle that a court must accept all allegations as true, however, does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion to dismiss, a complaint must state facts that, when accepted as true, state a facially plausible claim to relief. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Courts "are not required, however, 'to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.'" *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Sprewell v. Golden St. Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

"Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).

ISK brings three claims under the Lanham Act, citing 15 U.S.C. § 1125(a) for each: false advertising (Count I), contributory false advertising (Count II), and false association (Count III).[7]

### *1. False Advertising*

To allege a false advertising claim, the plaintiff must show that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 298–99 (4th Cir. 2017) (quoting *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501 (4th Cir. 2015)). The plaintiff "must be able to point to at least one challenged statement that satisfies all five Lanham Act requirements." *Id.* at 299. Although the Lanham Act does not define "commercial advertisement," the Fourth Circuit did so in an unpublished opinion: "commercial speech . . . for the purpose of influencing consumers to buy goods or services," and "the representations . . . must be sufficiently disseminated to the

---

[7] In its brief in opposition to the defendants' motion to dismiss, ISK clarifies that it brings Count I under § 1125(a)(1)(B) and Count III under § 1125(a)(1)(A). (ECF No. 19, at 15); *see also supra* note 1.

7

relevant purchasing public." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 256–57 (4th Cir. 2017). To determine whether a statement amounts to commercial speech, courts consider "(1) whether the speech is an advertisement; (2) whether [the] speech refers to specific products or services; (3) whether the speaker has an economic motivation for the speech; and (4) 'the viewpoint of the listener,' i.e. whether the listener would perceive the speech as proposing a transaction." *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 331–32 (4th Cir. 2015) (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 285–86 (4th Cir. 2013)) (noting that these "factors are cumulative [and] the absence of any particular element does not necessarily render the speech noncommercial").

The defendants argue that ISK's false advertising claim fails for three reasons: ISK (1) "does not allege any false or misleading statement;" (2) "relies on an insufficiently disseminated advertisement;" and (3) "fails to plead sufficient facts that ISK suffered an actual injury or one that was proximately caused by" either defendant. (ECF No. 18, at 2.) The defendants, therefore, challenge ISK's satisfaction of the first, fourth, and fifth elements of its false advertising claim. ISK argues that many different statements it attributes to the defendants amount to false advertising in violation of the Lanham Act. But because ISK need only identify one plausibly violative statement attributable to each defendant to survive the defendants' motion, Court focuses on just *one* statement attributable to each defendant.

### a. J&G's Statement

ISK cites the SDS J&G generated for WoodLock Bio-Shield I, to which PMG refers customers in one of its Facebook posts.[8] (ECF Nos. 1-1, at 2; 1-2.) In the SDS, J&G says that

---

[8] Although J&G and PMG are distinct entities, they work together to get WoodLock Bio-Shield products into the hands of consumers. (ECF No. 1 ¶¶ 5–6.) Indeed, J&G has a contractual relationship with PMG and manufactures the WoodLock Bio-Shield products with

8

handlers of WoodLock Bio-Shield I need not wear protective equipment.[9] The SDS also reports that WoodLock Bio-Shield I contains a maximum percentage weight of less than 10% of IPBC, a hazardous ingredient. Athough ISK does not allege a *minimum* percentage weight of IPBC present in WoodLock Bio-Shield I, the Court reasonably infers that IPBC represents at least 0.5% of the product.[10] Further, ISK alleges that, even at a concentration of 0.5%, IPBC "has been found to

---

knowledge that the products will "be advertised, promoted, marketed, distributed, and/or sold . . . in interstate commerce throughout the United States." (*Id.* ¶ 6.) Further, J&G provides the SDSs "to PMG for distribution during advertising and sales." (*Id.* ¶ 212.) Given the degree of association between J&G and PMG as to WoodLock Bio-Shield products as well as the stage of litigation and all the requisite inferences, the Court also attributes to J&G commercial advertisements appearing on PMG platforms or plausibly placed by PMG that refer to the safety of WoodLock Bio-Shield products. *Cf. BlueStar Mgmt. v. The Annex Club, LLC*, No. 09 C 4540, 2010 WL 2802213, at *5 (N.D. Ill. July 12, 2010). PMG endorses the safety of WoodLock Bio-Shield products based, in part, on the assurances J&G provides in the SDSs.

Accordingly, throughout its analysis of this claim, the Court will refer to this Facebook post, (ECF No. 1-1, at 2), as J&G's.

[9] Although ISK does not explain the purpose of the SDSs, the Court observes that J&G prepares each "in accordance with paragraph (d) of 29 CFR 1910.1200." (*See, e.g.*, ECF No. 1-2, at 1.) The Occupational Safety and Health Administration ("OSHA") requires "chemical manufacturers, distributors, or importers"—like J&G—to provide the SDSs; Part 1910 Section 1200 of Title 29 of the Code of Federal Regulations describes what "chemical manufacturers, distributors, or importers" must include in the SDSs "to communicate the hazards of hazardous chemical products." *Hazard Communication Safety Data Sheets*, OSHA, https://www.osha.gov/sites/default/files/publications/OSHA3493QuickCardSafetyDataSheet.pdf (last visited Dec. 20, 2021).

Although neither party provided the Court with this information, the Court takes judicial notice of these facts as a matter of public record. *See Willis v. City of Va. Beach*, 90 F. Supp. 3d 597, 605 (E.D. Va. 2015) ("The court may consider the facts alleged on the face of the Complaint, as well as 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint' at the motion to dismiss stage." (quoting *Silverman v. Town of Blackstone*, 843 F. Supp. 2d 628, 631 (E.D. Va. 2012))); *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 478 (E.D. Va. 2018) ("Federal Rule of Evidence 201 provides that a court may judicially notice a fact 'that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'").

[10] If IPBC presented itself in a percentage as low as 0.5%, the Court infers that the SDS would reflect a maximum percentage weight closer to that number.

9

have certain adverse effects" on humans, "including irritation, sensitivity, and toxicity to various systems." (ECF No. 1 ¶ 44.) ISK also cites the EPA's advice to those who handle products containing IPBC: wear personal protective equipment such as "long-sleeve shirt[s] and long pants, chemical-resistant gloves, [and] shoes plus socks." (*Id.* ¶ 49 (quoting *EPA R.E.D. Facts: IPCB*, https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/fs_PC-107801_4-Mar-99.pdf)). From these allegations, the Court infers that J&G made a false representation in the SDS by stating that handlers of WoodLock Bio-Shield I need not wear any protective equipment.

The Court also finds that by referring customers from the public Facebook page to the SDS, J&G made this misrepresentation about WoodLock Bio-Shield I in a commercial advertisement.[11] The Court infers that J&G intended the Facebook post to bolster sales of WoodLock Bio-Shield products. The Court, therefore, finds this Facebook post amounts to sufficiently disseminated commercial speech.

ISK's allegations also satisfy the second, third, and fourth elements of the false advertising test. The misrepresentation—that handlers of WoodLock Bio-Shield need not wear personal protective equipment—likely deceived a substantial number of consumers and influenced their purchasing decisions. Further, by making this misrepresentation on a public Facebook page, J&G placed this false statement in interstate commerce. *See Geiger v. C&G of Groton, Inc.*, 424 F. Supp. 3d 276, 293 (D. Conn. 2019) ("Alleging the images were posted on social media adequately alleges that the Defendants put the images into interstate commerce.").

Finally, by making this misrepresentation, J&G caused ISK to suffer an actual injury. *See*

---

[11] J&G implicitly incorporated into the Facebook post the contents of the SDS, including the misrepresentation it contains, by referring customers to the SDS "[f]or further information." (ECF No. 1-1, at 2.)

*Lexmark Int'l, Inc.*, 572 U.S. at 133. ISK says that "[a]s a direct and proximate result of [the d]efendants' [misrepresentation], ISK has and will continue to suffer damage to its business, reputation, goodwill, and the loss of sales, profits, and customers." (ECF No. 1 ¶ 201.) Accepting these allegations as true, the Court infers that customers continue purchasing WoodLock Bio-Shield I, in part, because of the assurance that its handlers need not wear personal protective equipment. These consumers, therefore, do not seek wood protection products from other suppliers like ISK.[12]

For these reasons, ISK's false advertising claim against J&G survives.

### b. PMG's Statement

As for ISK's false advertising claim against PMG, ISK cites an advertisement that PMG plausibly placed in Pallet Central Magazine which says that "WoodLock Bio-Shield Mold Inhibitor is safe for employees and machinery."[13] (ECF Nos. 1 ¶ 156; 1-10.) According to ISK, this advertisement contained a "false or misleading description of fact or representation of fact." 15 U.S.C. § 1125(a)(1). According to the defendants, this advertisement does not amount to false advertising because it does not contain a false statement; specifically, the defendants contend that WoodLock Bio-Shield products *are* safe for employees because the products do not exhibit the same characteristics as the hazardous ingredients they contain. Put differently, the defendants accuse ISK of erroneously attributing the characteristics of IPBC and OIT to the WoodLock Bio-

---

[12] *See Lexmark Int'l, Inc.*, 572 U.S. at 133 ("[A] plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrong by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff.").

[13] The defendants claim no connection to the advertisement in Pallet Central Magazine. (ECF No. 18, at 16.) Although discovery may reveal facts that support this contention, the Court finds it more than plausible that PMG placed the advertisement for WoodLock Bio-Shield products.

11

Shield products.

Although discovery may reveal facts that establish the defendants' position, ISK sufficiently alleges that PMG's advertisement in Pallet Central Magazine contained a "false or misleading description of fact, or false or misleading representation of fact" for this stage of litigation. 15 U.S.C. § 1125(a)(1). For all the reasons explained in Section II.A.1.a, reasonable inferences lead the Court to find that handlers of WoodLock Bio-Shield I should wear protective gear because of the presence of IPBC.[14] Thus, PMG's representation that "WoodLock Bio-Shield Mold Inhibitor is safe for employees," without any caveat about the need for protective gear, is plausibly false or misleading. Further, by placing the ad in Pallet Central Magazine, published by National Wood Pallet & Container Association, an entity with more than "670 company members in 28 countries," PMG made this misrepresentation in a sufficiently disseminated commercial advertisement. (ECF No. 1 ¶¶ 154, 155.)

ISK's allegations also satisfy the second, third, and fourth elements of the false advertising test. The misrepresentation—that WoodLock Bio-Shield is safe for employees—likely deceived a substantial number of consumers and influenced their purchasing decision. Further, by making this misrepresentation in Pallet Central Magazine, PMG placed this false statement in interstate commerce.

Finally, PMG says that ISK fails to allege any actual injury arising from this advertisement. But accepting ISK's allegations as true, the Court infers that customers continue purchasing WoodLock Bio-Shield I, in part, because of PMG's representation that WoodLock Bio-Shield I is

---

[14] The Court need not consider whether OIT's inclusion in WoodLock Bio-Shield II and WoodLock Bio-Shield H has the same effect to determine whether the general statement— "WoodLock Bio-Shield Mold Inhibitor is safe for employees"—is false or misleading. The Court, therefore, confines its analysis to IPBC's effect on WoodLock Bio-Shield I.

12

safe for employees. Consumers, therefore, do not seek other suppliers of wood protection products, like ISK. Thus, ISK sufficiently alleges that PMG directly engaged in false advertising through its advertisement in Pallet Central Magazine.

### 2. *Contributory False Advertising*

ISK also brings a contributory false advertising claim against the defendants. The degree of involvement by the defendant distinguishes a direct false advertising claim from a contributory false advertising claim: in a direct false advertising case, the defendant made the misrepresentation itself; in a contributory false advertising case, the defendant induced or caused another to make the misrepresentation.

First, the parties dispute whether a claim for contributory false advertising even exists under the Lanham Act. Although the Fourth Circuit has not recognized such a claim, the Eleventh Circuit has. *See Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1276–77 (11th Cir. 2015). The Eleventh Circuit found that § 1125(a)(1)(B) allows false advertising claims based on contributory liability after considering (1) the "judicially developed doctrine" of contributory liability in "the trademark infringement arena," *id.* at 1274, (2) statutory interpretation that supports the equal availability of contributory liability for false advertising, (3) the "principles underlying the Lanham Act," *id.* at 1276, and (4) the absence of any indication that Congress intended "to limit the statute's scope in this way," *id.* at 1276–77. This Court agrees with the Eleventh Circuit's conclusion: the Lanham Act creates liability for contributory false advertising.[15]

---

[15] This Court's allowance of ISK's contributory false advertising claim—novel in the Fourth Circuit—to proceed beyond the defendants' motion to dismiss keeps with the judicial disfavor towards dismissing claims because they do "not fall within the four corners of our prior case law." *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (quoting *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004)). "[T]he court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather

13

Further, this Court adopts the test announced in *Duty Free Americas*. "[T]o state a contributory false advertising claim":

> First, the plaintiff must show that a third party in fact directly engaged in false advertising that injured the plaintiff. Second, the plaintiff must allege that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it.

*Id.* at 1277.

Having found that a claim for contributory false advertising exists, the Court next considers whether ISK adequately alleges this claim against each defendant.

### a. Against J&G

ISK adequately alleges a contributory false advertising claim against J&G. First, ISK alleges that PMG "directly engaged in false advertising that injured" ISK, *Duty Free Ams., Inc.*, 797 F.3d at 1277, by placing an advertisement in Pallet Central Magazine that states "WoodLock Bio-Shield Mold Inhibitor is safe for employees and machinery," (ECF Nos. 1 ¶¶ 155, 156; 1-10.) For the reasons set forth in Section II.A.1.b, the Court finds that by placing this advertisement in Pallet Central Magazine, PMG plausibly engaged in false advertising.

ISK also alleges that J&G "contributed" to PMG's conduct—placing the ad at issue in Pallet Central Magazine—"by knowingly inducing or causing the conduct." *Duty Free Ams., Inc.*, 797 F.3d at 1277. Specifically, by misrepresenting the necessity of personal protective equipment for those handling WoodLock Bio-Shield I in the SDS,[16] J&G caused PMG to represent that "WoodLock Bio-Shield Mold Inhibitor is safe for employees." (ECF Nos. 1 ¶ 156; 1-10); *see Duty Free Ams., Inc.*, 797 F.3d at 1277 (explaining that the plaintiff satisfies the second element

---

than a pleader's suppositions." *McGary*, 386 F.3d at 1270 (quoting *Elec. Constr. & Maint. Co. v. Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir. 1985)).

[16] *See supra* Section II.A.1.a.

of the contributory false advertising claim by alleging that the defendant induced, caused, "or in some other way work[ed] to bring" the third party's false advertising about). Put differently, PMG endorsed the safety of WoodLock Bio-Shield products in its advertisement based, in part, on J&G's assurance that those handling WoodLock Bio-Shield I need not wear personal protective equipment.

For these reasons, ISK's contributory false advertising claim also survives against J&G.

### b. Against PMG

ISK also adequately alleges a contributory false advertising claims against PMG. For all the reasons set forth in Section II.A.1.a, ISK adequately alleges that "a third party"—J&G—"in fact directly engaged in false advertising that injured" ISK. *Duty Free Ams., Inc.*, 797 F.3d at 1277. As for the second element, PMG "materially participat[ed]," *id.*, in this conduct by distributing the SDS that J&G created "during advertising and sales" of WoodLock Bio-Shield I. (ECF No. 1 ¶ 212.) Accordingly, ISK's contributory false advertising claim survives against PMG.

### 3. *False Association*

To state a claim for false association, ISK must allege that the defendants "used a designation in interstate commerce in connection with goods and services; that the designation was 'likely to cause confusion, mistake or deception as to origin, sponsorship, or approval of defendant's goods or services'; and that [ISK was, or is] likely to be, damaged by these acts."[17] *JTH Tax, Inc. v. Williams*, 310 F. Supp. 3d 648, 654 (E.D. Va. 2018). "Designation" refers to "any word, term, name, symbol, or device, or any combination thereof." *Ullah v. Linkenauger*, No.

---

[17] The Fourth Circuit prefers that courts refer to claims brought under § 1125(a)(1)(A) section as "false association" claims as opposed to "false designation" claims. *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 705 n.4 (4th Cir. 2016).

15

1:20cv634, 2020 WL 9459338, at *3 (E.D. Va. Oct. 2, 2020) (emphases omitted) (quoting 15 U.S.C. § 1125(a)(1)(A)).

ISK cites a post on PMG's public Facebook page in which PMG said that WoodLock Bio-Shield "is a proven EPA registered product." (ECF Nos. 1 ¶ 119; 1-1, at 2.) According to ISK, "WoodLock Bio-Shield is *not* registered with [the] EPA." (ECF No. 1 ¶ 120 (emphasis added).) As a result, this post may deceive "[c]onsumers . . . into believing that WoodLock Bio-Shield has been authorized" by the EPA. (*Id.* ¶ 225.) Further, this misrepresentation damages ISK's business. (*Id.* ¶ 226.) Although not alleged explicitly, the Court infers that this misrepresentation about WoodLock Bio-Shield's registration with the EPA causes more consumers to purchase WoodLock Bio-Shield products instead of ISK's products, thereby depriving ISK of customers. Thus, ISK's false association claim survives against PMG.

As for ISK's false association claim against J&G, that too survives the defendants' motion. For the reasons explained in Footnote 8, the Court also attributes this Facebook post to J&G. (ECF No. 1-1, at 2.) As a result, the analysis above applies equally to J&G, and ISK's false association claim against J&G remains.

### *B. Virginia Consumer Protection Act (Count IV)*

ISK alleges that the defendants violated the VCPA by engaging in deceptive trade practices and misrepresenting the attributes of WoodLock Bio-Shield products. The defendants argue that ISK lacks standing to bring action under the VCPA. ISK, of course, says that it *does* have standing to sue under the VCPA. If the Court disagrees, however, ISK makes another request: that the Court construe this claim as one under Virginia's false advertising statute. *See* Va. Code Ann. § 18.2-216.

16

First, the Court considers whether ISK has standing to sue the defendants under the VCPA. "Although the Virginia Supreme Court has not weighed in, courts in this district have decided that competitors lack standing under the VCPA because the legislature intended the statute to protect consumers." *BHR Recovery Cmtys., Inc. v. Top Seek, LLC*, 355 F. Supp. 3d 416, 424 (E.D. Va. 2018); *see also H.D. Oliver Funeral Apartments, Inc. v. Dignity Funeral Servs., Inc.*, 964 F. Supp. 1033, 1039 (E.D. Va. 1997). The General Assembly passed the VCPA "to promote fair and ethical standards of dealings between suppliers and the consuming public." Va. Code Ann. § 59.1-197. Under Virginia law, courts must construe remedial statutes, like the VCPA, "'liberally, so as to suppress the mischief and advance the remedy' in accordance with the legislature's intended purpose." *Rector & Visitors of Univ. of Va. v. Harris*, 239 Va. 119, 124, 387 S.E.2d 772, 775 (1990) (emphases omitted) (quoting *Bd. of Supervisors of King & Queen Cnty. v. King Land Corp.*, 238 Va. 97, 103, 380 S.E.2d 895, 898 (1989)). But allowing a competitor to sue under the VCPA does not promote fair and ethical standards of dealing between suppliers and the consuming public. *See Trans-Radial Sols., LLC v. Burlington Med., LLC*, No. 2:18cv656, 2019 WL 3557879, at *9 (E.D. Va. Aug. 5, 2019) ("[O]nly consumer transactions qualify for coverage under the VCPA."). ISK, therefore, lacks standing to sue the defendants under the VCPA. *Id.*

Next, the Court considers ISK's alternative request, which would allow ISK to amend its complaint through its opposition to the defendants' motion to dismiss. The Court will decline ISK's request. Should ISK wish to bring a claim for false advertising under Virginia law, ISK may seek to amend its complaint pursuant to Federal Rule of Civil Procedure 15.

### *C. Common Law Unfair Competition (Count V)*

ISK accuses the defendants of violating Virginia's common law by "intentionally and maliciously ma[king] false statements and material omissions in their marketing and sale of

WoodLock Bio-Shield," thereby competing unfairly. (ECF No. 1 ¶ 237.) The defendants say that this claim fails because Virginia's common law does not protect against false advertising. ISK contends that Virginia law does not foreclose "a claim for false advertising under the common law." (ECF No. 19, at 17.)

Virginia courts and federal courts interpreting Virginia law alike have explained that Virginia law "does not recognize false advertising as a form of common law unfair competition." *Trans-Radial Sols., LLC*, 2019 WL 3557879, at *9; *see Mid-Atl. Telecom, Inc. v. Long Distance Servs., Inc.*, 32 Va. Cir. 75, 77 (1993). Nevertheless, ISK urges the Court to "follow[] the precedent in other states" and "recognize the viability" of false advertising as violative of common law unfair competition. (ECF No. 19, at 17.) This Court, however, declines to expand Virginia law and will dismiss this claim. *See Burris Chem., Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993) ("[T]he federal courts sitting in diversity rule upon state law as it exists and do not surmise or suggest its expansion.").

## V. **CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part the defendants' motion to dismiss. (ECF No. 17.) The Court will dismiss the Virginia Consumer Protection Act claim against both defendants (Counts IV) and the Virginia common law claim against both defendants (Count V). The Court will allow the following claims to proceed against both defendants: the false advertising claim (Count I); the contributory false advertising claim (Count II); and the false association claim (Count III).

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 12 January 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge